Good morning, Chase Golan, federal offender, on behalf of the appellant Ms. Chaudhry. Your Honor, I'd like to reserve two minutes for rebuttal. The issue presented here today is whether the government can conduct a destructive search at the border without any individualized suspicion. What the government is asking for here today is for this court to go further than it has before, to go further than any other courts that share a border circuit, to go further than even the Supreme Court was willing to go in Flores-Montano and allow for the destruction of automobiles without any suspicion whatsoever. Your Honor, in this case, the government... Distinguishing an automobile from a spare tire? Yes, I am, Your Honor, and I think there's good grounds to do so. This court in Cortez Rocha took great pains to distinguish damage to the tire from damage to the car itself. The court specifically stated while there was damage to the spare tire, the inquiry and the important factor is whether or not there was damage to the vehicle itself. In this case, there was damage to the vehicle itself. Because I'm a mechanical illiterate, was the vehicle actually drilled or was it just the bed liner? Your Honor, it's my understanding that it was, in fact, the vehicle itself. It was the top layer of the bed. And, Your Honor, there was some confusion in the record. One agent said that this part of the truck was, in fact, metal, and the other officer said it was plastic. But it was into the body of the truck itself. There certainly was no operational danger from this particular intrusion. Your Honor, I respectfully disagree. I think that any time a government official takes a drill into the body of a vehicle, there's per se danger. Don't generalize. Okay. Because it does make a difference. We just saw it with the door panels, where in the car the activity is taking place. Because there are different parts of the car that are more or less impenetrable, significant to the operation of the car. So, for example, if they drilled a hole into the door of the car from the outside, disfiguring the car, that might be, in some person's view, objectionable. But in the bed of a truck that's not visible normally, such as this case, what's the argument? Is it just the mere fact that it's penetrating the surface of the car? Is that your position? Well, Your Honor, several things. I think that here this case is distinguishable from the last. Mr. Hernandez's case, because here there was actually destruction done to the vehicle itself. It was into the body of the truck. And it was in a location where there was a potential for some harm or danger. As stated in the record, this was the drilling took place in the area of the gas tank, around the area of the gas tank. And we heard in Flores Montano that one out of ten seizures, or one out of ten illegal aliens that are discovered brought into this country in or around the area of the gas tank. What the government is asking for here is the authority to conduct a drilling search in the area of the gas tank, where there could be damage done to the vehicle, damage done to important wiring in the car, or damage done to or great harm done to a person who is, in fact, concealed in an area where people are commonly concealed, Your Honor. I think that the damage done was in a location that was destructive above just drilling into the car. This is an important area in the bed of the truck on top of the area where the gas tank is. Further, Your Honor, I think this obviously, this case is distinguishable from Cortez Rocha, because here we do have destruction of the vehicle. And I think the correct way to read Supreme Court precedent in Flores Montano, and in Cortez Rocha, is first the court looked for destruction of the vehicle. After the court in Flores Montano found no destruction of the vehicle, it went a step further. It went a step further and looked for an effect on the operability of the vehicle, operability or safety. It made that inquiry, however, only after determining that there was no damage to the vehicle. Well, this is a plug, this is a hole about the size of my, or maybe smaller than my small fingernail. Well, I measured it a pencil. Okay, that's pretty close. And again, I'm a mechanical illiterate, but I assume that you can just plug that pretty easily, and we're talking about the bed of the truck. So just to be a little colloquial, what's the big deal? Your Honor, the government drilled a hole over a quarter-inch thick into the body of my client's vehicle. Obviously, there's some concern here. As I said, it depends where a quarter-inch thick hole would be drilled into. This could have been drilled into the gas tank. It could have been drilled into. Well, it could have been, would have been, should have. I mean, it was drilled where it was drilled, so that's what we're talking about here. Was this drilling so offensive as to a constitutional violation? I believe it was, Your Honor, and I think we have guidance, and the other circuits do agree with that. We have expressly disapproved of the reasoning of the other circuits in Cortez. I understand that, Your Honor. However, the Supreme Court looked at these same other circuits, and they specifically had the chance to overrule or abrogate those decisions. They refused to do so. In fact, they cited the law. But we pretty much have, so. Your Honor, I understand that. However, I disagree. I think that the important factor here is that three circuits, three other circuits, have viewed the issue of drilling. They've all come to the same conclusion that this is valid of the Fourth Amendment. The touchstone of the Fourth Amendment is reasonableness, and all three circuits or every other circuit to view this issue has agreed and has come out against this without reasonable suspicion. Okay. I'm trying to focus and get your views because we have said that those cases were before the Supreme Court's decision in Flores, and therefore their reasoning no longer applies, and we said that in Cortez. And this panel is bound by what we said in Cortez. So even though you disagree with that, why doesn't Cortez control our analysis, at least, if not the result here? Your Honor, I think, well, first of all, as I said, I think this case is distinguishable from Cortez-Rocha in that there was destruction in the vehicle here and not in the other. As to the issue of how this court was analyzing the out-of-circuit opinions, I think that they are, if nothing else, they are instructive. As I said, these are three other circuits. They've all looked at the issue, and they've all come out against it, regardless of whether or not they deem it to be a routine search or a non-routine search. They've all looked at the same issue, and they've ruled that it does, in fact, require reasonable suspicion. The government is asking this court, the Ninth Circuit, to be the only court in the country which would allow the — Well, the Ninth Circuit said that removing the gas tank was unreasonable, too. But that didn't keep the Supreme Court from saying it was okay. I mean, that's — the whole thing is why is this particularly offensive? Your Honor, it's particularly — with reference to Flores-Montano, the Supreme Court specifically contrasts. It took great pains to contrast the removal of a gas tank from the destruction and the kind of destruction that's involved in this case. And they cited two cases that involved drilling, cases that are similar to this case here, where it's — they actually drilled into the body of a vehicle, drilled into the body of a camper or some other good. The Supreme Court was inferring that this is exactly the kind of destruction that does require reasonable suspicion. And with that, Your Honor, I'd like to reserve the rest of my time for your vote. I have one question, factually. Is there any evidence that the drill site on this truck did, in fact, risk hitting the gas tank or that the agents affirmative — if it did, that the agents affirmatively either didn't know that or did know that? Yes, Your Honor, I think so. I think the —  Well, okay, first as to whether or not it was — whether or not it had a potential or a danger of hitting the gas tank, on page 77 of the ER, the agent testified that the gas tank was just past the rear of the tire and it was underneath the bed of the truck. Here, the drilling took place on the top of the bed of the truck, drilling down towards the gas tank. So I think there was danger here. Further, the — on ER 70, Your Honor, the agent said that he started the drill right through the bed — well, perhaps into the bed, through the bed liner and into the bed of the truck, into the area where the gas tank was. And there is support in the record that there was a great danger of hitting the gas tank here, Your Honor. And that's your testimony. Okay. Your Honor, this is Mark Rahy for the United States again. To pick right up on one of the questions that Judge Fischer asked, the evidence here was that this drilling was not near the gas tank. And, in fact, that evidence can be found in excerpts of records 78 through 79 and also 98. What the K-9 officer testified to was that the gas tank itself was located directly behind the passenger compartment and that the fuel lines ran alongside the sides of the flatbed. He drilled two feet from the rear gate in the middle of the bed. And, in fact, the district court also, in making its findings in this case — and this was the excerpt of Record 98 reference that I made — the trial court found, quote, that the gas tank was located closer to the front of the bed of the truck, right behind the passenger compartment. This drilling occurred two feet from the rear of the bed of the truck. So I think on that evidence, the record does not indicate that there was any danger and that the inspector knew what he was doing in this case. Mr. Skolnik, recognizing and putting aside what we said in Cortez about the reasoning or the continuing viability of the out-of-circuit authority on drilling, Mr. Skolnik obviously makes a — Mr. Strahan. Pardon me? Mr. Strahan. I know. Mr. Skolnik obviously makes a forceful argument that three circuits have said that drilling into the car is a bad thing to do. Why shouldn't we be influenced by that? Well, the most important reason why, Your Honor, is because all three of those cases were decided before Flores-Mitano. And yesterday, in fact, I ran a Westlaw search. Neither — none of those circuits — it was the First Circuit in the Robles case, the Fifth Circuit in the Rivas case, Tenth Circuit in the Carrion case — had any occasion to reassess the continuing viability of those cases after Flores-Mitano, which came down in March of 2004. So that alone should give this Court reason to pause, because every one of those cases depended on that distinction between a routine and a non-routine search. If that language permeates those opinions, it was exactly that distinction that the Supreme Court disavowed in the Flores-Mitano case. And it said not only that distinction, but said there's no room — or this is actually Cortez Rocha now saying there's no room for complex balancing tests. But the Supreme Court did say in Flores-Mitano that the kind — the privacy and integrity interests of the human body in the Alimentary Canal search cases, those interests are not present in a vehicle. And, again, I believe that sort of analysis was not taken into account by those other out-of-circuit cases. And that's why this Court shouldn't give those cases any weight on this issue. We don't — Also, in these cases, the government's kind of taking, in a way, an artificial position. You don't want to rely on the fact that you really had reasonable suspicion in all these cases. You're just trying to force the decision on how far you can go without any suspicion. Should we buy into that, or should we look at the fact that the dog got all excited and ran over and wanted to chew up the truck? Your Honor, understandably, I would say we're still going to disavow reliance on that. And there's a few reasons why. I mean, most importantly, these cases occurred at the border. And it goes without saying how important it is that the government have an ability to prevent the importation of contraband or dangerous articles. Why aren't you bringing us some cases where you didn't have reasonable suspicion and you drilled a hole? In real life, you're so busy at the border, you're not going to just willy-nilly drill holes into trucks when there's absolutely no suspicion. I agree with that, Your Honor. But it also is true, if this Court were to add another reasonable suspicion layer onto that calculus, that would have an impact on the day-to-day functioning at the border. Well, but just bring us a case where you've gone and done this when you didn't have even a scintilla of suspicion. Then I would feel much more comfortable looking at it. This is never, never land that you're bringing us. To some extent, Your Honor. But it should give this Court almost greater reassurance. It shows that the kind of scenarios that were envisioned in the dissent to Cortez Roca are not happening on a day-to-day basis. These employees are. They do have integrity. They're not just taking the opinion in Cortez Roca in one hand and wielding a knife in the other, as was portended in that case. I mean, I don't – these cases are what they are. Well, that case just came down. I mean, I'm sure it'll percolate up if you are. Well, you never know. But, you know, in this case, though, I mean, if we look at the facts of this one, again, it wasn't particularly offensive. It was minimal damage. If we applied sort of the approach of Cortez Roca to look to the extent of the damage, here was a 516th-inch hole. It was less than an eighth of an inch deep. The inspector testified that was the smallest drill bit available at the port of entry that day. But even though I think I essentially agree with you on that, but why do I have to decide it? Well, because in this case, we disavowed reliance on all these other factors as reasonable suspicion. And it's something – Do we have to disavow them? Don't we look at the whole record? Well, I don't know, Your Honor. I mean, if it's an argument that the government isn't making, I would say it's been waived by us to some extent. And, you know, we put the facts before you that we have it. Well, we had a case earlier this week where the government waived the argument by not making it, but urged us that, sua sponte, we can and should look at harmless air. Well. Because it was to the government's advantage in that case. Well, I suppose the difficulty is one we've created ourselves in that you have to qualify the dog. Well, it actually goes back to the whole Sedano area. I'm not sure that we created the problem. If the dog has to be qualified and they're unwilling to qualify it. In this case, we have what the dog did. We have the testimony that this handler had been working with this particular dog for five years, and they were certified every year, and there was a certificate in the record. That seems pretty strong evidence that we've got a good dog. True. And he did his duty. Well, that's true. You know, and again, actually, one thing I would bring up to the Court's attention, again, this is from the Flores-Montano record, the same Jason Ahern declaration, that's the chief field officer. He brings up another point. He says that a lot of times seizures at the borders come about from informational confidential informants. The government doesn't want to be in a position, if reasonable suspicion has to be the standard, a lot of those sources will be compromised. That kind of investigatory tool will no longer be available. There's also a deterrence function that comes from the ability to do these searches suspicionless. If the smugglers know that there has to be reasonable suspicion for any kind of drilling, they will make more use of compartments that were at issue in this case, which were submerged just beneath the floor, the bed of the truck. Having the ability to conduct random block blitzes sometimes, all of this, this, did Speaker percolate, this percolates back to the smugglers and affects their ability, just from a reasonable inference, to attract people to continue doing this work. If they know that the government. Well, bring me one of those cases. I'll take that back to my office, Your Honor. Maybe we will someday. You know, but on this case. Let me ask another question, sort of getting anecdotal a little bit today. I also had a post-Flores-Montano case from the border, but that involved use of the buster. Now, the buster was advertised in that case as being the non-intrusive way to sense where stuff might be stored, either in gas tanks or the like. Is the buster not available to work in this kind of a truck bed situation? Honestly, I don't know, Your Honor. And I know you're referring to the Camacho case. I don't know. I don't know. You know, sometimes there are only so many of those devices available. I'm not familiar with the record of that case. But I do know its whole purpose is to measure the density of concealed objects in solid containers, basically. But, unfortunately, the record doesn't show that now. But, of course, from Cortez Roca, we also know that the least restrictive means analysis has been rejected in this situation. So I don't know that that can be held against the government, that that isn't part of the record. But I think, basically, unless this Court has any further questions on this issue, we would. I don't think so. All right. If we do, we'll nail you on the next case. Okay. Just briefly, Your Honor, I urge this Court to decide this case based on there being no reasonable suspicion. As the government has conceded here, they conceded in the District Court that they did not provide sufficient discovery for the dog alert. We asked for this discovery. It was not provided. As I submitted just last week, part of the Sonorano case, our expert, in fact, needs additional discovery to determine the reliability of the dog. What the government has provided here is just the same thing that they provided in the Nava case and in cases after Sonorano, which this Court has specifically ruled is not good enough to provide for the reliability of the dog. This Court, obviously, is in no position to overrule a prior three-judge panel. And I think that this is a good case for this case to decide without reasonable suspicion. Okay. Thank you very much. Thank you. The matter just argued will be seen next to your argument in Flores-Montana.
judges: B. Fletcher, Rymer, Fisher